## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANICE A. LAMISON, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 07-306 |
| | ) |
| | ) |
| | ) |
| | ) Judge Kim R. Gibson |
| BOTTLING GROUP, LLC (d/b/a | ) |
| THE PEPSI BOTTLING GROUP), and | ) |
| NEW BERN TRANSPORT CORP., | ) |
| | ) |
| | ) |
| Defendants. | ) |

### OPINION AND ORDER

Despite modern society's substantial wealth and impressive recent advances in technology, mosquitoes still bedevil us, just as they pestered our ancestors. Similarly, despite modern progressive efforts, discrimination still infects our social and employment relationships to some degree. In 1869, Myra Colby Bradwell passed the Illinois Bar, but was refused admission to practice on the now-bizarre grounds that she was a married woman. In the 140 years since that injustice, brave efforts of various reformers spurred evolution in the workplace, and an increased role for women. In some professions historically closed to women, including the law, women now constitute a substantial portion of the workforce.

However, the instant dispute involves the heavy trucking industry, where women's inroads are less trenchant: approximately five percent of this country's truck drivers are women.[1]

---

[1]Raju Chebium, *Truck Driving Gets Feminine Touch*, U.S.A. Today, Sept. 9, 2006. While this numerical disparity may have various causes, such an imbalance nonetheless suggests a possibility that invidious gender discrimination occurs within the trucking industry.

Despite this statistical imbalance, Plaintiff Janice A. Lamison worked successfully for several years as a truck driver for Defendants Bottling Group, LLC (d/b/a "The Pepsi Bottling Group) and New Bern Transport Corp. However, on August 28, 2006, Ms. Lamison was fired. Obviously, termination of employment is often a type of waterloo for the discharged employee, resulting directly in embarrassment, emotional distress, loss of income, and, frequently, an associated stigma. Ms. Lamison attributes this adverse employment action to invidious and unlawful discrimination on the basis of her gender. She alleges violations of federal law and Pennsylvania law. Defendants counter that the termination's rationale was far less invidious: simple failure to follow important company protocols. Generally, an employer may discharge an employee for any reason, so long as the reason is not prohibited by law.[2]

Additionally, Ms. Lamison alleges that after her termination, Defendants unlawfully retaliated against her by informing potential employers that she raised discrimination charges. Defendants also deny this allegation.

This Court is charged as arbiter between these two perspectives. Now before the Court is Defendants' Motion for Summary Judgment (Doc. No. 40). Upon consideration of the entire record, the Court finds that there is no genuine issue as to any material fact, and that Defendants are entitled to judgment as a matter of law; therefore, the Court will grant Defendants' Motion.

## I. Procedural History

On November 20, 2007, Janice A. Lamison filed a Motion for Leave to Proceed In Forma Pauperis, which was granted by the Court. On November 26, 2007, Ms. Lamison filed a

---

[2]*See Tims v. Bd. of Ed. of McNeil*, 425 F.2d 551, 552 (8th Cir. 1971)(explaining that an employer "has the right to discharge an employee for good reason, bad reason or no reason, absent discrimination.").

Complaint.  On January 8, 2008, Ms. Lamison filed an Amended Complaint; on March 24, 2008, she filed a Second Amended Complaint, naming Defendants Bottling Group, LLC, New Bern Transport Corp., and Robinson & Sons Trucking, Inc.  On April 10, 2008, Defendants New Bern Transport Corp. and Bottling Group, LLC filed an Answer to the Second Amended Complaint. On May 21, 2008, Ms. Lamison filed a notice of voluntary dismissal as to Defendant Robinson & Sons Trucking, Inc.

Defendants New Bern Transport Corp. and Bottling Group, LLC have requested in their briefing to be collectively referred to as PBG; consequently, the Court will refer to both remaining Defendants as "PBG" throughout this document.

As stated in the Second Amended Complaint, Ms. Lamison alleges violations of Title VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations Act.  Furthermore, Ms. Lamison alleges that after she filed this lawsuit, PBG retaliated against her by informing potential employers of Ms. Lamison's allegations regarding unlawful discrimination.

On January 30, 2009, Defendants moved for summary judgment (Doc. No. 40), and filed various briefs and documents in support of this motion.  On March 23, 2009, after being granted some continuances, Plaintiff responded to Defendant's Motion (Doc. No. 58), and also filed various other documents in support of her position.

## II. Factual History[3]

Ms. Lamison was employed by PBG as a "Transport Driver."  Via tractor trailer, Ms. Lamison transported Pepsi products to PBG warehouses.  Ms. Lamison worked as a Transport

---

[3]The following facts are based upon Defendants' Statement of Material Facts (Doc. No. 40) and Plaintiff's Response (Doc. No. 56), and Plaintiff's Concise Statement of Material Facts (Doc. No. 57), as well as Defendant's "Counter Statement of Facts" (Doc. No. 63).

Driver from March 16, 1998 until August 28, 2006.

PBG executes several functions related to the provision of consumer beverage products, including manufacturing, bottling, and distribution. PBG operates facilities throughout the United States, including in Johnstown. The following PBG employees are relevant actors in this matter:

1) Erni Vizi, PBG's "Transport Manager for Western Pennsylvania", who supervised the truck drivers at PBG's Johnstown facility, including Ms. Lamison in 2005 and 2006;

2) Ms. Caralyn Birkahn, PBG's "Human Resources Manager", responsible for human resources at several PBG locations in Pennsylvania, including Johnstown;

3) Gerry Moss, Dispatcher at PBG's Johnstown facility.

According to internal company documents, PBG requires its employees to comply with all safe driving and DOT regulations. Such DOT regulations require truck drivers to complete a post-trip inspection, which includes numerous steps involving inspection of the vehicle. Such regulations exist to attempt to limit the number of on-road vehicle problems, which could cause serious accidents. Where a driver locates a deficiency during a post-trip inspection, a mechanic is notified to investigate the potential need for maintenance.

These post-trip inspection reports are documented on "Vehicle Condition Reports" ("VCRs"). During 2005 and 2006, PBG conducted various training sessions as to how to properly complete post-trip inspections; Ms. Lamison attended these meetings.

During the relevant time period, PBG was party to a Collective Bargaining Agreement ("CBA") with Teamsters Local Union 110. The CBA specifies that Transport Drivers are to be paid for one-half hour of time for completing a post-trip inspection and refueling. Thus, according to the CBA, Transport Drivers would be paid for 30 minutes of work for completing a post-trip

4

inspection, regardless of how long the inspection actually takes them, with exceptions allowed only under extenuating circumstances.

At some point in August, 2005, Mr. Vizi approached Ms. Lamison and told her that she must complete the post-trip inspection in 30 minutes. Ms. Lamison responded that she was not sure how to cut down her time in completing inspection, but that she would try to do so.

After this discussion with Mr. Vizi, Ms. Lamison attempted to finish her inspections in 30 minutes. She claims that she completed the inspections as best as she was able during the time frame dictated; meanwhile, PBG simply argues that she did not complete the inspections. For the next year, because she was unable to cover everything on the inspection list in the allotted time frame, Ms. Lamison refused to check the "no defects" box on her VCR. She apparently felt that doing so would represent an inappropriate personal guarantee that there were no defects on the vehicle. However, aside from one instance, on August 7, 2006, Ms. Lamison signed the VCRs.

On August 7, 2006, Ms. Lamison submitted a VCR on which she inadvertently failed to sign off in the Post-Trip Inspection section. The dispatcher working at the checker station returned the form to Ms. Lamison, and informed her of the deficiency. Ms. Lamison wrote "no time to post-trip" on the VCR. This VCR was brought to Mr. Vizi's attention.

On August 10, 2006, Mr. Vizi and Ms. Birkahn spoke with Ms. Lamison about the August 7, 2006 VCR. Ms. Lamison explained that she simply forgot to sign her name. However, Ms. Lamison indicated that she purposely left the "no defects" box unchecked. Ms. Lamison described her lack of willingness to check the "no defects" box as a direct consequence of Mr. Vizi's previous instructions to complete the task in 30 minutes; she explained that she tried to get done what she could during that allotted 30 minutes.

Ms. Birkahn elected to suspend Ms. Lamison pending further investigation. After additional investigations, including a review of previous VCRs completed by Ms. Lamison, Ms. Birkahn discovered that over a one-year period, Ms. Lamison repeatedly and consistently did not check the "no defects" box.

On August 14, 2006, Ms. Birkahn and Mr. Vizi met with Ms. Lamison and another PBG Transport Driver, Wayne Fleegle, who was the union steward. At this meeting, Ms. Lamison pled her case that 30 minutes was insufficient time for a post-trip inspection, and that she acted properly by doing as much as she could in a half hour. Mr. Fleegle indicated that he would not interpret an unchecked "no defects" box as an indication that the prior driver did not perform a post-trip inspection. Ms. Lamison alleged that other drivers did not perform post-trip inspections. Ms. Lamison's apparent evidence for this belief was individual experiences prior to trips, when she noticed maintenance issues that should have been observed in a properly conducted post-trip inspections.

On August 28, 2006, PBG terminated Ms. Lamison's employment for failing to complete post-trip inspections, in violation of PBG policy and DOT regulations. Furthermore, the termination letter indicated that Ms. Lamison's signing of the VCRs represented that a post-trip inspection had been properly conducted.

Subsequent to the termination of her employment, Ms. Lamison pursued grievances through arbitration via her union, and also through the Equal Employment Opportunity Commission, and the Pennsylvania Human Relations Commission.

Ms. Lamison also applied for new trucking positions with other transport driver employers. Such applications proved unsuccessful, and Ms. Lamison alleges that a PBG employee informed

these potential employers of her lawsuit and claims against PBG.

## III. Jurisdiction and Venue

This Court exercises jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

## IV. Standard of Review

Federal Rule of Civil Procedure 56(c) dictates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The moving party need not produce evidence showing the absence of a genuine fact, but must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the moving party points out a hole in a material element of the nonmoving party's case, the nonmoving party is then obligated to point to specific evidence that establishes a genuine issue for trial. *Id.* at 324.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. A court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Se. Pa. Transp.*

7

*Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The Third Circuit explained:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

## V. Discussion

### A. Parties' Arguments

Defendants argue that they are entitled to summary judgment as to both of Ms. Lamison's claims for the following reasons:

> (1) Lamison cannot establish *prima facie* gender discrimination or retaliation cases; and (2) PBG had a legitimate, non-discriminatory reason for terminating Lamison—PBG terminated her after she disclosed that she did not perform post-trip inspections of her vehicle as required by Department of Transportation ("DOT") safety regulations and PBG policy for an extended period of time—and Lamison cannot establish that this reason was a pretext for unlawful gender discrimination.

Doc. No. 41, pp. 1-2.

Ms. Lamison argues that the Court should deny the Motion, because she "has met her burden of providing evidence of a prima facie case . . . and because several important issues of material fact exist . . . ." Doc. No. 58, p. 10.

### B. Defendants are Entitled to Summary Judgment as to Ms. Lamison's Discriminatory Firing Claim

Ms. Lamison claims that she was fired because of PBG's discriminatory animus against her, on the basis of her gender. In order for Ms. Lamison to succeed on this claim against PBG,

8

she must ultimately prove that PBG intentionally discriminated against her, and that Ms. Lamison's gender was a determinative factor in PBG's decision to terminate her employment.

Ms. Lamison does not present any direct evidence of gender discrimination such that a reasonably jury could conclude that gender discrimination was a motivating factor for any employment practice. *See Desert Palace Inc.v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). Therefore, as acknowledged by both parties, Ms. Lamison's claim is properly analyzed under the now-familiar burden-shifting analysis first stated in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See, e.g.. Makky v. Chertoff,* 541 F.3d 205, 215 (3d Cir. 2008) ("A Title VII plaintiff may state a claim for discrimination under either the pretext theory set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the mixed-motive theory set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons."); *see also Stackhouse v. Penn. State Police,* 2006 WL 680871 at \*4 (M.D. Pa. Mar. 14, 2006) ("A pretext theory of discrimination is typically presented by way of circumstantial evidence, from which the finder of fact may infer the falsity of the employer's explanation to show bias.").

Ms. Lamison's discrimination claims under both Title VII and the PHRA are analyzed under the same legal standard. *See Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996).

The analytical framework proceeds as follows: first, Ms. Lamison bears the initial burden of establishing a prima facie case of discrimination; second, if a prima facie case is established, then PBG is required to articulate a legitimate and non-discriminatory reason for terminating Ms.

9

Lamison's employment; third, if PBG meets that burden, then Ms. Lamison must establish, through submission of evidence, that PBG's offered reason is pretextual, such that a reasonable factfinder could either disbelieve the reason, or believe that discrimination was more likely than not a motivating or determinative reason for the termination. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see also Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999).

### 1. Ms. Lamison Fails to Adequately Prove the Required Elements of a Prima Facie Case

The elements of a prima facie case depend upon the facts of the particular case. *See, e.g., Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir. 1999). In this matter, to present a prima facie case of gender discrimination, Ms. Lamison must show: 1) that she is a member of a protected class; 2) that she performed the duties required by her position in a satisfactory manner; 3) that she suffered an adverse employment action; and 4) the circumstances giving rise to the adverse employment action create an inference of discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999). This Court finds that for purposes of the summary judgment analysis, Ms. Lamison offers sufficient evidence as to the first and third prongs, but fails to provide sufficient evidence as to the second and fourth prongs.

As to the second prong, Ms. Lamison must present some evidence that shows that she performed the duties required by her position in a satisfactory manner. As detailed in the facts section, *supra*, Ms. Lamison's job required her to complete post-trip inspections. More importantly, her job required her to check the "no defects" box in the post-trip section of the VCR.

10

In refusing to check that box, Ms. Lamison did not perform the duties required by her job satisfactorily. Ms. Lamison acknowledges her failure to check the box. She told Mr. Vizi, Ms. Birkahn and Mr. Fleegle: "I didn't check the no defects box on the VCR form because I was afraid I had missed something . . . [and I didn't check the no defects box because] I was not guaranteeing that I hadn't accidentally missed something." Doc. No. 57, ¶ 38.

The problem in the situation is evident from this quotation. Obviously, Ms. Lamison was frustrated by the time limit imposed upon her post-trip inspection. This frustration led her to feel logically and morally justified in refusing to check the box. Ms. Lamison appears to have strangely interpreted checking the box as constituting some type of personal, all-encompassing "guarantee" that nothing was wrong with that particular truck. Given that she operated under such a clearly faulty interpretation, it is no wonder she avoided checking the box. However, any common-sense assessment of the form would not interpret its terms so hyper-literally. The form does not look for some type of existential guarantee that no defects exist anywhere in the truck; instead, the form asks simply whether, during the ordinary course of the driver's typical inspection, any defects were observed.

Ms. Lamison acknowledges that completing the inspection and filling out the form was a requirement of the job. She further acknowledges that she refused to do so. It is not for this Court to ultimately determine the reasonableness of that position; instead, this Court merely states the job requirement, notes the undisputed factual basis for the disparity between that requirement and Ms. Lamison's action, and therefore concludes that a reasonable jury could not possibly find that Ms. Lamison performed her job duties satisfactorily.

11

Furthermore, the undisputed evidence also demonstrates that there is no inference of discrimination. Ms. Lamison acknowledged to her supervisors that for approximately one year, she failed to complete post-trip inspections, and consequently refused to check a "no defects" box on the VCR form. Doc. Nos. 42 and 56, ¶¶ 87-90. Plaintiff seeks to frame the issue in terms of whether Ms. Lamison actually completed proper inspections or not; however, that is not the dispositive issue. Rather, the dispostive issue is what she told Vizi, and what she did or did not fill out in the required forms for the period from August, 2005 to August, 2006. Ms. Lamison admitted to refusing to properly fill out the VCR, and admitted to knowing that she was not properly filling out the form. Even this acknowledgment alone was an act of insubordination, and its associated pedantry would signal serious problems in the employee's work performance; given the importance of post-trip inspections in light of safety concerns, and in light of Ms. Lamison's comments and her numerous incomplete VCRs, PBG was justly concerned as to what exactly had been occurring over the previous year. Given the situation facing PBG in August, 2006, and the information presented to it through investigation and discussion with Ms. Lamison, the Court finds that Ms. Lamison's later insistence that she actually had performed full inspections are of no moment, because the proper frame for analysis is what her comments to her supervisors led them to believe about her behavior. Furthermore, her actual performing the inspection is of no greater importance than the subsequent task of accurately conveying the substance of her inspection via the VCR.

A rational supervisor faces a difficult management task when dealing with an employee who has an ax to grind regarding the wisdom or practicality of official corporate policy. Furthermore, PBG's response in the instant situation was necessarily magnified, given the inherent

12

dangerousness of the trucking industry and the connection between inspections, and trucker and public safety. By not checking that particular box, but nonetheless signing off on the forms, Ms. Lamison left it ambiguous as to what or whether she actually inspected. Common sense indicates that signing a form suggesting that an inspection was completed, when the inspector herself harbors various doubts about the efficacy of her inspection, represents a substantial safety risk, precisely because the reader of the form is left uncertain as to what was or was not inspected. Since PBG, like any company, is in the business of managing its risks and its employees' safety, its firing of an employee for nearly a year's worth of misrepresentation, on a matter of vital importance to the company's operations, does not raise any inference of illegal discrimination. While this situation likely could have been more easily resolved via more efficient and effective communication between PBG and Ms. Lamison, the termination of Ms. Lamison's employment is nonetheless a logical consequence of her own actions.

Ms. Lamison claims that an inference of unlawful discrimination arises because PBG did not discharge other male drivers for similar failings, and did not discharge a male driver who was allegedly involved in a hit-and-run incident. However, Ms. Lamison does not present any evidence whatsoever that other male drivers failed to complete post-trip inspections or properly complete VCRs. Furthermore, while she alleges that a male driver was not fired despite his involvement in a hit-and-run accident, she presents no evidence whatsoever. Summary judgment may not be avoided via rumor or conclusory statement. *See Jones*, 198 F.3d at 414 (explaining that plaintiff could not defeat a summary judgment motion by relying solely upon "numerous allegations . . . which he predicate[d] on nothing more than his beliefs without having actual knowledge of

13

them."); *see also El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (explaining that "[s]pecious objections will not, of course, defeat a motion for summary judgment . . . .").

Furthermore, even if Ms. Lamison presented evidence regarding the alleged hit-and-run driver, the Court finds that such an individual would not be sufficiently similarly situated so as to be helpful to Ms. Lamison's argument, because the individual's conduct is insufficiently similar to Ms. Lamison's conduct. *See Dowling v. Citizens Bank*, No. 05-cv-0914, 2007 WL 2752178, at *8 (W.D. Pa. Sept. 19, 2007) (explaining that for a plaintiff to make an argument based upon those similarly situated, the putative comparators must have engaged in substantially the same conduct as plaintiff.)

Absent discrimination, the law does not punish the termination of an employee who refuses to comply with company standards, especially where that refusal appears to be based solely upon a personal belief that those standards are difficult, impossible or unfair. This Court is not responsible for sitting as super-management to decide whether certain work standards, where applied equally to all employees, are reasonable; rather, this Court's sole task here is to assess whether a firing such as this could possibly give rise to an inference of illegal gender discrimination.

Upon consideration of all the evidence before it, the Court finds that a reasonable jury could not possibly determine that these circumstances give rise to an inference of discrimination. In sum, the Court finds that Ms. Lamison does not present a prima facie case; consequently, Defendant is entitled to judgment as a matter of law as to the discriminatory termination claims raised under Title VII and the PHRA.

14

**2. Even if Ms. Lamison Could Present a Prima Facie Case, a Reasonable Factfinder Could Not Disbelieve PBG's Offered Legitimate Non-discriminatory Reason, Nor Could the Factfinder Reasonably Believe that a Discriminatory Reason was a Motivating Cause of the Adverse Employment Action**

In the alternative, even assuming that Ms. Lamison could present a prima facie case, the Court finds that Ms. Lamison does not present sufficient evidence to raise reasonable doubts regarding PBG's proffered legitimate non-discriminatory reason.

Regarding this stage of the analysis, the Third Circuit explained as follows:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons ... was either a post hoc fabrication or otherwise did not actually motivate the employment action.... To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.... Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," ... and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Fuentes*, 32 F.3d at 764-65.

This Court finds that Ms. Lamison fails to demonstrate the required weaknesses in PBG's rationale.

First, at the time of the adverse employment action, Ms. Lamison told her supervisors that she did not perform complete post-trip inspections between August 2005 and August 2006. While telling them this, Ms. Lamison rested her case on the somewhat tenuous argument she was somehow compelled to perform overhasty post-trip inspections as a consequence of a substantively

15

unjust time limit. Furthermore, Ms. Lamison admitted that Mr. Vizi expressly told her that she was required to perform complete post-trip inspections. Nonetheless, frustrated with the time frame for the inspect, Ms. Lamison unilaterally elected to refuse to comply with what she perceived to be an irrational and impossible requirement. The merits of Ms. Lamison's perspective are not particularly relevant. Also lacking relevance is her perspective that her actions were justified by the unreasonable restrictions imposed upon her. Civil disobedience seemed to have worked out for Thoreau, but his situation differed mildly from most situations present in the modern workplace. Rather, employees must find ways to comply with explicit employer instructions.[4] In short, the Court notes that the offense giving proper justification for termination appears to be simple: Ms. Lamison informed her supervisors that she failed to complete a vital required task within an allotted time frame, refused to fill out the form as directed, and misled a superior about her intent to comply with his instruction. The Court finds that a reasonable jury could not possibly find that PBG's proffered rationales exhibit the required weaknesses.

Second, Ms. Lamison's comparisons, of her situation to the supposed situations of other male drivers, fail on both logical and evidentiary grounds, as discussed *supra*. In short, Ms. Lamison is obligated to support her allegations with some semblance of fact-gathering, which she does not. Presently non-existent factual support may have turned this into a trial case, including evidence that male employees acknowledged to superiors rushing through post-trip inspections, or that male employees refused to fill out forms as instructed.

---

[4] Those employees who insist upon finding fault with managerial policies, or insist upon performing tasks pursuant to their own putatively superior judgment, often find themselves unemployed and unemployable.

However, such evidence, or anything similar to it, is not before the Court, Ms. Lamison fails to raise a material dispute of fact as to whether PBG ever even considered gender in its decision to terminate her employment; consequently, PBG is entitled to judgment as a matter of law as to Ms. Lamison's discrimination claim.

### C. Defendants are Entitled to Summary Judgment as to Ms. Lamison's Retaliation Claim

Ms. Lamison's Amended Complaint also raises the claim that PBG informed her prospective employers of this lawsuit, in violation of Title VII. Upon review of the entire record, the Court finds that Ms. Lamison cannot establish a prima facie case of retaliation; consequently, PBG is entitled to summary judgment as to this claim.

Title VII prevents employers from retaliating because someone resisted discrimination. Section 704(a) states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by the subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

To state a Title VII claim for unlawful retaliation, Ms. Lamison must establish that she was discriminated against "because [she] opposed any practice made an unlawful employment practice by [Title VII]" or "because [she] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]. B. Schlei & P. Grossman, *Employment Discrimination Law* 533 (2d ed. 1983).

17

The Supreme Court, in *Burlington Northern* v. *Santa Fe Railway Co.*, held as follows: "The scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment related retaliatory acts and harm." 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). In 1977, the Supreme court removed all doubt as to the issue regarding former employees, holding that the statutory term "employees", as stated in the anti-retaliation provision of Title VII, includes former employees. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997). In a case applying an analogous anti-retaliation provision in the ADEA, the D.C. Circuit held that former employees are protected from various types of retaliation, so long as the alleged discriminatory retaliation relates to the employment relationship. *Passer v. Am. Chem. Society*, 935 F.2d 322, 331 (D.C. Cir. 1991); *accord Rutherford v. Am. Bank of Commerce*, 565 F.2d 1162, 1166 (10th Cir. 1977); *Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052 (2d Cir. 1978); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir. 1977).

Furthermore, numerous cases held analogous claims to be actionable. *See Rutherford*, 565 F.2d 1162 (holding that former employer's act of advising prospective employer that employee filed a gender discrimination charge was a retaliatory act under Title VII, and constituted a form of discrimination); *Pantchenko*, 581 F.2d 1052 (2d Cir. 1978) (labeling an employer's behavior as violative of anti-retaliation provision where employer refuses to provide postemployment reference letters in retaliation for employee's filing charges with EEOC); *Shehadeh v. Chesapeake & Potomac Tel. Co.*, 595 F.2d 711 (D.C. Cir. 1978) (holding that in certain circumstances, giving unfavorable reference may constitute discriminatory conduct); *Silver v. Mohasco Corp.*, 602 F.2d 1083 (2d Cir. 1979), *reversed on other grounds* 447 U.S. 807, 100 S. Ct. 2486, 65 L. Ed. 2d 532 (holding that potentially discrimintary blacklisting efforts by former employer were prohibited by

Title VII); *but see Ferguson v. Mobil Oil Corp.*, 443 F. Supp. 1334 (S.D.N.Y. 1978) (holding that allegations of "blacklisting" activities by former employer were outside the broad bounds of Title VII).

While assessing a case with a different factual and procedural setting, the Fifth Circuit aptly explained the rationale behind a broad protection for former employees:

> The possibility of retaliation, however, is far from being "remote and speculative" with respect to former employees for three reasons. First, it is a fact of business life that employers almost invariably require prospective employees to provide the names of their previous employers as references when applying for a job. Defendant's former employees could be severely handicapped in their efforts to obtain new jobs if the defendant should brand them as "informers" when references are sought. Second, there is the possibility that a former employee may be subjected to retaliation by his new employer if that employer finds out that the employee has in the past cooperated with the Secretary [of Labor]. Third, a former employee may find it desirable or necessary to seek reemployment with the defendant. In such a case the former employee would stand the same risk of retaliation as the present employee.
>
> There is no ground for affording any less protection to defendant's former employees than to its present employees.

*Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 306 (5th Cir. 1972).

Analysis of a retaliation claim under Title VII follows the same burden-shifting analysis described above. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

To establish a prima facie case of retaliation, Ms. Lamison must show the following: 1) she engaged in protected activity; 2) PBG took adverse action after or contemporaneous with the protected activity; and 3) causal link exists between the protected activity and the adverse action.

*See Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001) (citing *Farrell v. Planters*

*Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000)).

Upon review of all of the materials submitted in this action, this Court finds that Ms.

Lamison fails to show the second element of a prima facie retaliation claim, and therefore fails to

state a prima facie case.

Ms. Lamison, in her opposition brief to Defendant's summary judgment motion, describes

her argument in support of her retaliation claim as follows:

> Lamison also suffered retaliation due to PBG's disclosure of
> information about Lamison's discrimination case against PBG to
> prospective employers. Lamison has testified that a pattern seemed
> to exist when she applied for a position. The company would
> interview Lamison and progress to the point where the company
> representative would contact PBG for a background search. From
> this point in time, Lamison never heard from the prospective
> employer again. (PSOF §§ 60-62). Lamison recognized this pattern
> with Edwards, Kephard Trucking, and Robinson & Sons Trucking,
> Inc. (PSOF § 60). Robinson's representative, David Leisgang,
> asked Lamison about her discrimination case after he spoke with
> someone who was not employed by PBG (PSOF §§ 64-66).
> Leisgang had contacted PBG about Lamison, and Gerry Moss had
> informed Leisgang that Lamison was a good worker. Leisgang
> averred that Moss did not inform him about Lamison's
> discrimination case and that he "never had any communication of
> any kind with anyone employed by Bottling Group, LLC, d/b/a The
> Pepsi Bottling Group or New Bern Transport Corporation regarding
> Lamison's lawsuit against Pepsi Bottling Group, or any legal action
> that Lamison had pursued against anyone." (PSOF § 64) Leisgang
> contacted PBG about Lamison in February 2008, and Vizi had left
> PBG in May, 2007, so Vizi was not employed by PBG when
> Leisgang obtained the information about Lamison's case against
> PBG. (PSOF §§ 64-68). It is a question of material fact whether or
> not Vizi was the person who informed Leisgang about Lamison's
> case. Providing this information to Leisgang, and, possibly to other
> prospective employers, constituted retaliation against Lamison for
> engaging in the protected activity of filing the case against PBG.

20

Doc. No. 58, pp. 8-9. This selection, which apparently constitutes the entirety of Ms. Lamison's opposition to Defendants' summary judgment motion as to the retaliation claim, is problematic in numerous ways. Fundamentally, it fails to provide reference to specific facts that show a genuine issue for trial.

Federal Rule of Civil Procedure 56(e)(2) states: "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

Ms. Lamison's first justification for her retaliation claim is a supposed pattern, wherein three employers allegedly considered hiring Ms. Lamison until they called PBG. In theory, such an argument could potentially be persuasive, at least at the summary judgment stage. For instance, it makes no logical sense that an employer would undertake the due diligence step of calling a prospective applicant's previous employers, unless that prospective employee was under serious consideration for a position. Therefore, theoretically, where three separate job hiring processes stall at that particular stage, such seems to call for further investigation.

However, the briefing in this case does not present even a small amount of fruit from any such investigation, if one occurred. Plaintiff's conspiracy theory is not supported by any statements from any of the employers who called PBG. Furthermore, the theory is not supported by any detailed explanation of the employers' hiring process, including their own explanations as to whether PBG put forth negative commentary as to Ms. Lamison. Such information would be crucial to determining whether Ms. Lamison's conclusory theories could possibility be found

persuasive by a jury. Juries decide matters upon consideration of the facts as presented at trial; however, here, Ms. Lamison presents no facts in support of the position that she would like the jury to take. While Ms. Lamison labels the issue as containing disputed material issues of fact, in reality, her theory does not contain any facts. She cites, in her statement of facts, her own statements that after potential employers contacted Pepsi, the hiring process "went cold." Reasons for such coldness could be innumerable, including a change in hiring needs, a higher-level committee's unrelated decision, or simply the alternative selection of a more favored candidate. In fact, every job hunter in the country often experiences this same unfortunate coldness; poor results do not make evidence of discriminatory retaliation.

A complete absence of facts, in this situation, might have allowed Ms. Lamison to survive a motion to dismiss, but it will not save her from summary judgment. The discovery phase of this action is over, and the summary judgment stage calls for the presentation of "affidavits" or "specific facts showing a genuine issue of trial." Fed. R. Civ. P. 56(e)(2). And yet, despite this standard, Ms. Lamison offers only a naked theory. The Court is somewhat flummoxed at the apparent absence of fact-gathering in Plaintiff's presentation of her case.

Ms. Lamison then states that Mr. Leisgang was informed about her discrimination claims by someone who is not employed with PPG. Then, in a leap of reasoning which the Court does not follow, Ms. Lamison theorizes that this mystery informant may have in fact been Mr. Vizi, who left PBG in May, 2007. This detective-like surmise then leads to Ms. Lamison's unsupported speculation: "It is a question of material fact whether or not Vizi was the person who informed Leisgang about Lamison's case." Doc. No. 58, p. 9. Again, a complete absence of any facts supporting her position does not create a disputed issue of material fact. Ms. Lamison proposes

22

a conclusion that would help her argument, but the basis for the conclusion is not just unclear, it is nonexistent.

Where a party fails to "present any evidence demonstrating that there were genuine issues for trial," but "merely allege[s], without any supporting evidence," summary judgment was properly granted. *Hughes v. United States*, 953 F.2d 531, 542 (9th Cir.1992).

Because Ms. Lamison's allegations are entirely unsupported, meaning she presents essentially zero evidence whatsoever to prove that any potential employer received any conceivably disparaging information from PBG, this Court has no choice but to order judgment as a matter of law in favor of Defendants on Ms. Lamison's Title VII claim of retaliation. This Court finds no disputed material issues of fact as to this claim, because there is no factual support for the claim. Therefore, Defendants are entitled to Summary Judgment as to Ms. Lamison's retaliation claim.

## V. Conclusion

The Court prefaced this opinion with a brief discussion of the harms of gender discrimination; however, the evidence presented in this case does not raise any material issues of fact the resolution of which could potentially show that Defendants committed acts of invidious discrimination, or retaliation, with respect to Ms. Lamison. Consequently, Defendants' Motion for Summary Judgment will be granted in full. An appropriate order follows.

23

## ORDER

And Now, this 26th Day of August, 2009, IT IS HEREBY ORDERED that Defendants'

Motion for Summary Judgment as to all claims in Plaintiff's Complaint is HEREBY GRANTED

IN FULL, and the Clerk of Courts is directed to mark this case closed.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

24